OPINION OF THE CHIEF JUSTICE AND THE ASSOCIATES JUSTICES OF THE SUPREME COURT IN THE MATTER OF THE APPLICATION OF THE HONORABLE H. ALBERT YOUNG, ATTORNEY GENERAL OF THE STATE OF DELAWARE.

*Supreme Court, March 11, 1954.*

SOUTHERLAND, Chief Justice: This is an application by the Attorney General for compensation, in addition to his salary, for services in representing the State before the Supreme Court of the United States in the cases of *Gebhart v. Belton and Gebhart v. Bulah,* (No. 448, Oct. Term, 1952, and No. 10, Oct. Term, 1953), involving the issue of segregation in the public schools of the State of Delaware. Such additional compensation is authorized by the provisions of 29 *Del.C.* § 2501, which read:

"§ 2501.  Salary

"(a)  The salary of the Attorney General shall be $7,500 per annum.

"(b)  Whenever the Attorney General of this State has appeared for the State in the Supreme Court of the United States in any suit, writ of error or appeal to which the State is a party, and has argued on behalf of the State the questions involved in such suit, writ of error or appeal, there shall be paid to him by

the State Treasurer such sum, in addition to his salary, as may be approved by the Chief Justice and Associate Justices of the Supreme Court of this State, by a certificate in writing."

The facts are these:

Our decision in the Gebhart cases, 33 *Del.Ch.* —, 91 *A.2d* 137, denied the State's request for time to equalize the school facilities, and affirmed the Chancellor's order that the plaintiffs be forthwith admitted to the schools for white pupils. Upon advice of the Attorney General the State applied for and was granted *certiorari* from the Supreme Court of the United States in order that this single question —the nature of the relief to be given—should be reviewed by that Court. 344 *U.S.* 891, 73 *S.Ct.* 213, 97 *L.Ed.* 689.

At that time (November 1952) there were awaiting argument in that Court four other cases involving the much broader issue of the constitutionality of segregation in the public schools. These cases, and the Delaware case, were argued in December 1952. The Attorney General prepared the brief and made the argument on behalf of the State of Delaware upon the question of relief. On June 8, 1953, the Supreme Court of the United States ordered the cases restored to the docket for reargument in October and requested counsel for all of the parties, including the State of Delaware, to brief and argue ten questions touching both the constitutional issue and the issue of relief. See 345 *U.S.* 972, 73 *S.Ct.* 1114-1118, 97 *L.Ed.* 1388. The Attorney General thereafter briefed and argued these matters.

A reading of the questions propounded by the Supreme Court of the United States shows clearly that an adequate and intelligent discussion of them entailed extensive historical research by counsel on constitutional and social questions, and in particular research into the circumstances surrounding the adoption of the Fourteenth Amendment to the federal Constitution and the enactment of contemporary federal legislation relating to the civil rights of the Negro. The Attorney General found it necessary to employ counsel to assist him. Louis J. Finger, Esquire, a former Deputy Attorney General, was retained for this purpose. Delaware counsel examined and digested the Congressional Debates touching these matters, as well as source

material gathered by other counsel relating to the adoption of the Fourteenth Amendment by the ratifying states. As appears from their main brief on reargument, counsel also developed from historical material the background of segregation in Delaware and of our constitutional provisions of 1897 providing for equal but separate public schools. *Const. Art.* X, § 2, *Del.C.Ann.*

Such a task inevitably consumed a great amount of time, and the efficient handling of such material in briefs and arguments called for arduous and sustained intellectual effort. The Attorney General estimates that from September 1952 to December 1953 he devoted an average of fifty hours a month to these cases.

The gravity of the issues before the Supreme Court and their far reaching social and political implications need no emphasis. They are of national as well as of local importance. Without going into further detail, we are content to say that our own acquaintance with the litigation,[1] and the facts set forth in the Attorney General's moving papers and briefs, convince us that issues of great importance to the people of the State were, from the point of view of state policy, thoroughly and ably presented to the Supreme Court of the United States.

The case is one falling within the provisions of the statute. The Attorney General is entitled to an allowance. The question is, as always, how much?

We turn to the origin and purpose of the law. It was enacted in 1881, 16 *Del.L.Ch.* 332, and it is a fair inference that its passage was occasioned by the pendency in the Supreme Court of the United States of the first boundary litigation between Delaware and New Jersey. In that case there was at stake the State's title to the sub-aqueous soil of the Delaware River within the twelve-mile circle. At that time the annual salary of the Attorney General appears to have been $1,500. *Act of March* 23, 1871, *Vol.* 14, *Del.L.Ch.* 36.

The statute thus appears to reflect a legislative recognition of the unfairness of requiring a part-time official to perform unusual and extraordinary services, outside of his ordinary and expected duties,

---

1. Two of the members of this Court participated in the Gebhart cases. 33 *Del.Ch.* —, 91 *A.2d* 137.

without providing reasonable additional compensation. We say "a part-time official" because in Delaware it is a custom of long standing to staff the Attorney General's office with lawyers who also engage in private practice. According to general belief this custom evidences a legislative policy that permits the State to obtain the services of well qualified attorneys at salaries that would not be attractive if the official were required to devote his entire time to his duties.

The act of 1881 is not the only instance of the legislative policy of awarding additional compensation to the chief law officer of the State for special service. A joint resolution of March 27, 1879, 16 *Del.L.Ch.* 206, supplemented by joint resolutions of May 15, 1891, and May 2, 1893, 19 *Del.L.Ch.* 366 and *Ch.* 861, directed the Attorney General to take steps to collect from the United States certain sums due and owing to the State of Delaware and provided for special compensation of twenty-five per cent of the amount so collected. These claims were collected in 1908 by the then Attorney General, and the special compensation, amounting to more than $20,000, was paid.[2]

We revert to the act of 1881. We have been unable to find any prior instance of its use.[3] Hence no standards for determining the amount of an allowance under it have been evolved.

It might be said that in the light of the legislative policy above adverted to the additional compensation of the Attorney General should be judged by the standards which are applicable to compensation from private clients in private matters, upon the theory that his available time for private practice is diminished by the performance of extraordinary duties and that the standards applicable to such private practice are to that extent to govern the amount of the allowance.

■■ We are of the opinion, however, that these standards are inapplicable. The language of the statute indicates that the allowance is to be something "in addition to his salary". The inference is that

---

2. State Auditor's Report, 1909, *p.* 74.

3. The first New Jersey-Delaware boundary suit was settled by the compact of 1905, 23 *Del.L.Ch.* 5, and was never argued. The second boundary case was briefed and argued by special counsel.

the award of compensation must take into account the fact that he is a salaried public officer. As we all know, the monetary reward of important public office is, in general, far below that of comparable private practice or employment.

We must therefore seek precedents in analogous cases, namely, cases of court-awarded compensation to persons performing public or quasi-public duties. The illustration that naturally occurs to the mind is that of compensation allowed to receivers and their counsel in receiverships or similar proceedings. In *McWilliams, Jr., Co. v. Missouri-Kansas Pipe Line Co.*, 21 *Del.Ch.* 308, 190 *A.* 569, Chancellor Wolcott observed that in making allowances out of funds belonging to others the court does not possess the same freedom of disposition that they have who are dispensing moneys that are their own. Quoting with approval the remark of Chief Justice Taft that in such matters there is no room for the practice of "vicarious generosity", he observed that so far as concerns receivers and trustees and their attorneys, who are all officers of the court, "they can neither expect nor be paid more than 'moderate compensation.'" 21 *Del.Ch. at page* 322, 190 *A. at page* 576. This principle applies with especial force to additional allowances to holders of public office as such.

On the other hand, compensation for valuable service well performed should not be awarded in a niggardly or grudging spirit, lest support be lent to the view, sometimes expressed, that important public service is unattractive to able men.

■ With these general observations in mind we turn to the application presented to us. One aspect of it should be noticed at once. The application covers the services of the Attorney General only. It is contemplated that special counsel will be separately compensated, and will make no application under this statute. There is ample precedent for the employment by the Attorney General of special counsel in cases of great importance in the Supreme Court of the United States, and it has been the practice to compensate them from available appropriations or from special appropriations made for the purpose.[4] Whether such special counsel could be compen-

---

4. In the first boundary suit, which never came to argument, the Attorney General and special counsel appear to have been allowed by the General Assembly

sated under this statute upon petition filed by the Attorney General is a question not before us and we express no opinion upon it. We confine ourselves to saying that in the light of the questions propounded by the Supreme Court of the United States as a predicate for reargument, and in view of the precedents in like cases, the employment of special counsel was entirely proper.

We revert to the amount of compensation requested. The Attorney General requests an allowance of $12,500. Tested by the standards prevailing in private practice—the importance and difficulty of the legal questions involved, the standing and ability of counsel, and the ability of the client to pay—the amount requested is probably less than would be justly demanded of a private client. But we must apply the standards which we have laid down. The compensation must be substantial, but it must also be considerably less than that which would be allowable in private practice. The allowance should therefore bear some relation to the salary, although no mathematical formula is feasible or proper. Thus in the first boundary suit the Attorney General, whose salary was then $2,000, 22 *Del.L. p.* 552, was allowed $3,000. The work in that case, as here, entailed much historical research, and also the taking of testimony intermittently over a period of years; but the case was not briefed or argued. (The difference in the value of money must, of course, be taken into account.) In this case the work extended over a period of fourteen months; the taking of testimony was not required, but the case was briefed and argued.

Taking into consideration all of the facts and principles of law above outlined, we do not think the additional compensation in this case should exceed the amount of the yearly salary. An allowance of $7,500 we think is reasonable.

A certificate to that effect may be presented.

WOLCOTT and TUNNELL, JJ., concur.

counsel fees of $3,000 and $2,500 respectively. Claims Act of 1905, 23 *Del.L.Ch.* 13. In the second boundary suit three special counsel were employed and were compensated partly from existing appropriations and partly from a special appropriation for the expenses of the suit. See *39 Del.L.Ch. 3.*